In re CHIN–LIANG CHAN, Debtor.

Atlantic Recording Corporation, etc., et al., Plaintiffs,

v.

Chin–Liang Chan, etc., Defendant.

Bankruptcy No. 02–44485TT.
Adversary No. 02–7230 AT.

United States Bankruptcy Court, N.D. California.

April 27, 2005.

Wayne R. Terry, Mitchell, Silberberg and Knupp LLP, Los Angeles, CA, for plaintiffs.

David Yang, Law Offices of David Yang, San Francisco, CA, for defendant.

## MEMORANDUM OF DECISION

LESLIE TCHAIKOVSKY, Bankruptcy Judge.

Plaintiffs Atlantic Recording Corporation et al. ("Plaintiffs") have a judgment against Defendant Chin–Liang Chan (the "Debtor") for willful infringement of their copyrights (the "Judgment"). In this adversary proceeding, they seek to except the judgment debt (the "Judgment Debt") from the Debtor's chapter 7 discharge pursuant to 11 U.S.C. § 523(a)(6). Plaintiffs filed a motion for summary judgment on this claim. For the reasons stated below, the motion will be granted.

## BACKGROUND

At all times relevant to the Plaintiffs' claim, the Debtor was the Chief Executive Officer of Media Group, Inc. ("Media Group"), a California corporation formerly headquartered in Fremont, California. Media Group was engaged in the business of compact disc ("CD") replication and services related to such replication. Plaintiffs are the owners of copyrights to various sound recordings.

On or about June 7, 2000, Plaintiffs filed an action against Media Group, Chan, and others in federal district court, alleging that the defendants had willfully infringed Plaintiffs' copyrights in 1,514 sound recordings (the "Copyright Infringement Action"). On August 14, 2001, the district court granted Plaintiffs' motion for summary judgment against Media Group, the Debtor, and others. A jury trial on damages was scheduled for January 8, 2002. However, trial of this action was stayed by the filing of a chapter 11 bankruptcy case by Media Group on November 5, 2001.[1]

Approximately eight months after Media Group's bankruptcy filing, Plaintiffs were granted relief from the automatic stay in Media Group's case so that they could proceed with a determination of their claim for damages in the Copyright Infringement Action. A jury trial was conducted, and on August 21, 2002, the Plaintiffs were granted a judgment in excess of $136,000,000 against Media Group, the Debtor, and others: i.e., the Judgment. In the meantime, on August 20, 2002, the Debtor filed a chapter 7 petition, commencing this case. On October 7, 2002, the bankruptcy court granted Plaintiffs' request for annulment of the automatic stay, thereby validating the Judgment with respect to the Debtor.

On November 6, 2002, Plaintiffs filed this adversary proceeding, seeking to except the Judgment Debt from the Debtor's chapter 7 discharge. On January 2003, the Debtor obtained relief from the automatic stay so as to prosecute an appeal from the Judgment. Prosecution of this adversary proceeding was held in abeyance while he did so. On March 30, 2004, the Ninth Circuit Court of Appeals dismissed the Debtor's appeal for procedural deficiencies.

On December 29, 2004, the Plaintiffs filed a motion for summary judgment in this adversary proceeding. The Debtor opposed the motion. The motion was heard on February 3 and April 7, 2005 and was taken under submission.

## APPLICABLE LAW

### A. EXCEPTION TO DISCHARGE FOR WILLFUL AND MALICIOUS INJURY

■ Section 523(a)(6) of the Bankruptcy Code provides that a chapter 7 discharge does not discharge an individual debtor from a debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The two prongs—i.e., "willful" and "malicious"—are analyzed separately. *In re Sicroff*, 401 F.3d 1101, 1105 (9th Cir.2005), citing *In re Su*, 290 F.3d 1140, 1146 (9th Cir.2002).

■ To satisfy the "willfulness" test, a creditor must prove that the debtor intended the injury, not just the act that caused it. *Kawaauhau v. Geiger*, 523 U.S. 57, 61–64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). However, the Ninth Circuit has construed this test as encompassing acts performed intentionally with knowledge that the injury was substantially certain to occur. *Su*, 290 F.3d at 1144. The test is subjective: i.e., the court must determine that the debtor actually knew that the injury was substantially certain to occur, not that a reasonable person would have known. *Su*, 290 F.3d at 1143–46.

■ To satisfy the test for "malice," a creditor must prove that the act was: (1) wrongful, (2) intentional, (3) necessarily caused injury, and (4) was done without just cause or excuse. *Sicroff*, 401 F.3d at 1106, citing *In re Jercich*, 238 F.3d 1202, 1209 (9th Cir.2001); *Su*, 290 F.3d at 1146–47. This test is necessarily objective. To hold a creditor's claim is dischargeable, the bankruptcy court must consider "just" the debtor's "cause" or "excuse" for committing the wrongful intentional act that necessarily caused the creditor's injury. *See Sicroff*, 401 F.3d at 1106–07; *In re Bammer*, 131 F.3d 788, 791 (9th Cir.1997).

### B. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to in-

**1.** Media Group's bankruptcy case was converted to chapter 7 on October 25, 2002.

terrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the nonmoving party must go beyond the pleading and identify facts demonstrating a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

Summary judgment should be entered against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. The nonmoving party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

### DISCUSSION

The Plaintiff contend that they are entitled to a nondischargeable judgment against the Debtor for the Judgment Debt as a matter of collateral estoppel based on the Judgment. Alternatively, they contend that, based on the evidence presented in support of this motion, there are no genuine issues of material fact and that the undisputed facts entitle them to a nondischargeable judgment against the Debt-

or for the amount of the Judgment Debt. The Court will address each legal theory in turn.

### A. COLLATERAL ESTOPPEL

██ Collateral estoppel, sometimes referred to as issue preclusion, bars relitigation of an issue previously decided if the party against whom the prior decision is asserted had "a full and fair opportunity to litigate that issue in the earlier case." *Allen v. McCurry*, 449 U.S. 90, 94–95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). In *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court held that collateral estoppel principles apply in bankruptcy cases and can be used to establish the nondischargeability of a debt. *Id.* at 284, 111 S.Ct. 654. Collateral estoppel applies only if an examination of the record of the earlier proceeding satisfies the bankruptcy court that the identical issue was raised and actually litigated in the prior case and that resolution of the issue was necessary to the judgment. *Combs v. Richardson*, 838 F.2d 112, 115 (4th Cir.1988). Issue preclusion is "problematic" if the standard for the previous judgment varied from the standard for determination of nondischargeability. *Id.* at 117.

██ In support of its motion for summary judgment on collateral estoppel grounds, the Plaintiffs submitted the district court's Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment; Etc. (the "District Court Order"). The District Court Order noted that, in their complaint, Plaintiffs asserted seven causes of action: (1) direct copyright infringement, (2) contributory copyright infringement, (3) vicarious copyright infringement, (4) conspiracy to infringe copyrights,[2] (5) violation of Cal.

---

**2.** The district court denied Plaintiffs' motion

for summary judgment on this claim. How-

Civ.Code § 980, (6) violation of Cal. Bus. & Prof.Code § 17200, and (7) conversion.[3] The district court granted summary judgment in favor of the Plaintiffs against the Debtor on the first, second, third, fifth, and sixth claims.[4]

The Court has reviewed the district court's findings and conclusions with respect to each of the claims on which it granted summary judgment. It concludes that none of the claims is sufficiently identical to the claim presented here to support the application of collateral estoppel.

## 1. Direct Copyright Infringement

The first claim for relief in the Copyright Infringement Action was for direct copyright infringement. With respect to this claim, the district court noted that the Plaintiffs were required to show "ownership of the allegedly infringed material" and "that the alleged infringers violate[d] at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." District Court Order, p. 6, 1. 22–p. 7, 1. 1. It observed that the defendants had conceded that Plaintiffs own the sound recordings upon which their claim was based and that Media Group and the other defendants copied these recordings without permission. This was sufficient to establish a claim for direct infringement.

In connection with this claim, the district court noted that knowledge is not an element of a direct infringement claim. District Court Order, p. 7, 1. 5.5. By contrast, as discussed above, to establish the nondischargeability of the Judgment Debt under 11 U.S.C. § 523(a)(6), to satisfy the "willfulness" prong, the Plaintiffs must prove that, at a minimum, the Debtor must have known that it was substantially certain that an injury would occur as a result of his intentional act. Therefore, the district court's judgment on the direct infringement claim will not support the application of collateral estoppel in this action.

## 2. Contributory Infringement

■ The second claim for relief in the Copyright Infringement Action was for contributory infringement. In connection with this claim, the district court noted that, to be liable, the defendant must have engaged in personal conduct that encouraged or assisted the infringement with knowledge of the infringing activity or with reason to know of it. District Court Order, p. 7, 1. 23–p. 8, 1. 6. Thus, there are three elements to this claim: (1) infringing activity, (2) personal conduct, and (3) knowledge or reason to know.

The district court noted that it had already determined that there was infringing activity in connection with the first claim for relief. It noted that the Debtor had admitted authorizing Media Group's employees to engage in the activity that resulted in the infringement. This established the Debtor's personal conduct. District Court Order, p. 8, 11. 17–19. It concluded that the third element—knowledge or reason to know—was satisfied by the Debtor's admission that, if Media Group had followed the Plaintiffs' guidelines, infringement would have been less likely.

---

ever, the basis for its ruling was not set forth in the District Court Order.

**3.** The district court denied Plaintiffs' motion for summary judgment on this claim. It observed that evidence of actual damages was required to establish a claim for conversion and that the Plaintiffs had failed to provide evidence of actual damages. District Court Order, p. 13, 11. 1–7.

**4.** Summary judgment was denied on the seventh claim for relief. For some reason, there was no ruling on the fourth claim for relief.

While this claim comes closer to the first as serving as a basis for collateral estoppel, it too falls short. To conclude that the Plaintiffs were entitled to a judgment against the Debtor for contributory infringement, the district court was not required to find that the Debtor knew of the infringing activity. It was sufficient for it to find that the Debtor had reason to know. As discussed above, the state of mind required for nondischargeability under 11 U.S.C. § 523(a)(6) is more stringent.

### 3. Vicarious Infringement

■ The third claim for relief in the Copyright Infringement Action was for direct copyright infringement. With respect to this claim, the district court found that an individual may be held liable for vicarious infringement when the individual has the right and ability to supervise the infringing activity and has a direct financial interest in the infringing activities. The individual need not have actual knowledge of the infringing activity.

The district court noted that the Debtor had admitted that he had the right and ability to supervise Media Group's employees and that he had a direct financial interest in Media Group's infringing activities. As a result, the district court concluded that the requirements of a claim for vicarious infringement had been established against the Debtor. District Court Order, p. 9, 11. 1–11. Again, because the district court was not required to find that the Debtor had actual knowledge of the infringing activity, collateral estoppel does not apply.

### 4. Willful Infringement

■ As noted above, a claim for willful infringement was not among the seven claims for relief recited by the district court at the beginning of its discus-

sion. Nevertheless, the District Court Order next discussed the Plaintiffs' right to summary judgment against the Debtor on such a claim. The district court noted that "willful" within the meaning of 17 U.S.C. § 504(c)(2) means "with knowledge that...[one's] conduct constitutes copyright infringement." District Court Order, p. 9, 1. 15. However, it also noted that "conduct is willful in this context if...[the] party recklessly disregards the copyright holders' rights." District Court Order, p. 9, 11. 18–19. By contrast, reckless disregard is insufficient to establish willfulness under 11 U.S.C. § 523(a)(6). *Geiger,* 523 U.S. at 61, 118 S.Ct. 974.

The district court noted that the Debtor had "acknowledged his awareness of the need to avoid copyright infringement" and "that he understood the need to screen customer orders for suspected copyright infringement." District Court Order, p. 10, 11. 2–4. It noted that the Debtor admitted that "use of the...[the Plaintiffs'] toll-free number to determine who owned the copyright to a given sound recording would have made copyright infringement less likely." Nevertheless, Media Group did not use this method of screening customer orders because it viewed this as a "waste of time." District Court Order, p. 10, 1. 4–7. Finally, it noted that Media Group admitted that, even when it became aware that a particular customer was seeking "to have an infringing order manufactured, it would not necessarily stop filling the customers' orders." District Court Order, p. 10, 11. 7–10.

The district court stated that " '[t]o refute evidence of willful infringement, [the defendant] must not only establish its good faith belief in the innocence of its conduct, it must also show that it was reasonable in holding such a belief.' *Columbia Pictures [Television v. Krypton Broadcasting of*

*Birmingham, Inc.]*, 106 F.3d [284] at 293 [(9th Cir.1997)]." The district court concluded that the defendants' admissions precluded the establishment of a reasonable, good faith belief. Thus, after it had been established that the Debtor committed an intentional act that resulted in a copyright infringement, the court placed the burden on the Debtor to meet both a subjective and objective standard of good faith: i.e., that the Debtor actually believed that his conduct was legal and that a reasonable person would have believed that his conduct was legal.

As discussed above, a claim for 11 U.S.C. § 523(a)(6) includes both a subjective and an objective element. "Willfulness" is judged subjectively; " " is judged objectively. From the district court's discussion, it appears that a claim for willful copyright infringement includes both the subjective and the objective test in its definition of "willfulness." Nevertheless, there are substantial differences in how these two tests are applied in the context of 11 U.S.C. § 523(a)(6) as compared to a claim for willful copyright infringement.

■ With respect to a claim for willful copyright infringement, once the infringement has been established, the debtor must satisfy both tests to avoid liability. By contrast, to prevail on a claim under 11 U.S.C. § 523(a)(6), the creditor must satisfy both tests. In addition, for a claim for willful copyright infringement, the burden of proof is on the debtor to establish a just

cause or excuse. The creditor has the burden of proving "malice" under 11 U.S.C. § 523(a)(6).[5] As discussed above, "malice" includes lack of just cause or excuse. Given these differences between the two types of claims, the district court ruling on this claim will not support collateral estoppel either.[6]

### 5. Statutory Damages for Copyright Infringement

■ The fifth claim for relief in the Copyright Infringement Action was for damages under Cal. Civ.Code § 980. With respect to this claim, the district court noted that California law provides a remedy for copyright infringement for rights fixed prior to February 15, 1972.[7] In the District Court Order, the district court stated that the Plaintiffs were entitled to summary judgment against the Debtor on this claim for the same reasons they were entitled to summary judgment on "their federal copyright infringement claim. . . ." District Court Order, p. 12, 11. 9–11. Because none of the bases for imposing liability on the Debtor for violation of federal copyright law is sufficient to support a collateral estoppel claim for a nondischargeable judgment under 11 U.S.C. § 523(a)(6), this ruling adds nothing to the Plaintiffs' motion.

### 6. Cal. Bus. & Prof.Code § 17200

■ The sixth claim for relief in the Copyright Infringement Action was for vi-

**5.** A lesser burden of proof in the prior action prevents the application of collateral estoppel. *Grogan v. Garner*, 498 U.S. 279, 284–85, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**6.** To have collateral estoppel, the issue determined in the prior action must be identical to the issue presented in the current action. *In re Cantrell*, 329 F.3d 1119, 1123 (9th Cir. 2003).

**7.** In the District Court Order, the district court noted that copyright owners may elect

to recover statutory damages in lieu of actual damages, citing 17 U.S.C. § 504(c). It noted that the Supreme Court recently held a portion of § 504(c) unconstitutional as contrary to the Seventh Amendment right to a jury trial, citing *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998). However, except for the provision doing away with the need for a jury trial, if demanded, § 504(c) remained intact. District Court Order, p. 10, 1. 18–p. 11, 1. 23.

olation of Cal. Bus. & Prof.Code § 17200. In the District Court Order, the district court noted that Cal. Bus. & Prof Code § 17200 et seq. prohibits a wide variety of unfair business practices. It does not support a claim for money damages. However, it does provide for equitable relief, including restitution and disgorgement. District Court Order, p. 13, 11. 9–15.

The district court concluded that, to the extent that Plaintiffs based their claim for damages for copyright infringement on federal copyright law, Plaintiffs' claim under Cal. Bus. & Prof.Code § 17200 is preempted by federal copyright law. However, it noted that Plaintiffs also asserted claims based on sound recordings created prior to February 15, 1972 which were governed by California law. With respect to those claims, their claim for violation of Cal. Bus. & Prof.Code § 17200 was not preempted. Thus, the district court concluded that, under Bus. & Prof. Code § 17200, to the extent the Plaintiffs are entitled to summary judgment on their claims for copyright infringement under Cal. Civ.Code § 980, they are also entitled to summary judgment on their claims for violation of Bus. & Prof.Code § 17200. District Court Order., p. 13, 1. 9–p. 14, 1. 1. As discussed above, because Plaintiffs' claims for copyright infringement under Cal. Civ.Code § 980 do not support collateral estoppel, the ruling on this claim does not assist the Plaintiffs.

### 8. Effect of Ninth Circuit Order

▮ Plaintiffs contend that, even if the Judgment, standing alone, does not support a ruling in their favor on collateral estoppel grounds, the Ninth Circuit's order dismissing the Debtor's appeal (the "Dismissal Order") enables it to do so. As noted above, in the Dismissal Order, the Ninth Circuit stated that the Debtor's appeal was dismissed for procedural failings. However, it also observed that the Debtor was not prejudiced by the dismissal because his appeal lacked merit.[8] The Ninth Circuit stated that the district court's decision was correct and that "ample, undisputed evidence supported the district court's conclusion that the Debtor committed willful copyright infringement." Dismissal Order, p. 3. It noted that the Debtor's defenses were conclusory and self-serving.

Plaintiffs appear to construe this comment to mean that, even if the district court did err in stating that "reckless disregard" satisfied the standard for "willfulness," the Debtor's appeal lacked merit. Since the Ninth Circuit previously stated it would not consider this argument, this construction makes no sense. In observing that the Debtor's appeal had no merit, the Ninth Circuit must be presumed to have been applying the less stringent standard of "willfulness" discussed above: i.e., including "reckless disregard." In addition, Plaintiffs misinterpret the purpose and effect of this language. The Ninth Circuit clearly dismissed the appeal on procedural grounds. Its only purpose in discussing the merits of the Debtor's appeal, or rather its lack of merit, was to note the lack of prejudice to the Debtor. If the Ninth Circuit had found more merit in the Debtor's appeal, it might have given the Debtor another chance despite his procedural failings. However, this language cannot be reasonably read as an affirmance of the Judgment on the merits. By dismissing the appeal, the Judgment became the only

---

8. On appeal, the Debtor attempted to argue that the district court erred when it stated that "reckless disregard" was a sufficient basis for willful copyright infringement. The Ninth Circuit refused to entertain this argument due to the Debtor's failure to raise it in the trial court.

final order upon which Plaintiffs may base their claim for collateral estoppel.

## B. GENUINE ISSUE OF MATERIAL FACT

The Plaintiffs also seek summary judgment based on the evidence presented in this case without regard to the doctrine of collateral estoppel. They contend that, based on the undisputed evidence presented in this action, there is no genuine issue of material fact as to whether the Debtor's conduct was willful and malicious within the meaning of 11 U.S.C. § 523(a)(6). In support of this ground for the motion, the Plaintiffs submitted a series of exhibits.[9] The exhibits are all documents that were filed in the Copyright Infringement Action.

The only exhibits containing evidence are Exhibits D and H. Exhibit D is the Declaration of V. Ron Ayala (the "Ayala Declaration"), the Regional Director of the Recording Industry Association of America ("RIAA").[10] Exhibit H is the Declaration of Karin G. Pagnanelli (the "Pagnanelli Declaration"), one of Plaintiffs' attorneys in the Copyright Infringement Action. Attached to Exhibit H are a series of exhibits consisting of discovery requests and responses, two letters, and an expert's report. These documents are authenticated by the Pagnanelli Declaration.

The Debtor offered no evidence in opposition to the motion prior to the February 3, 2005 hearing. At that hearing, the Court set a continued hearing and directed the parties to file supplemental briefs addressing the application to the facts of this case of the standard for willfulness established by *Geiger*. One week prior to the continued hearing, the Debtor filed a document entitled Supplemental Declaration of Debtor Jimmy Chan in Opposition to Motion for Summary Judgment (the "Supplemental Chan Declaration"). Attached to the Supplemental Chan Declaration was a copy of a declaration filed by Chan in the Copyright Infringement Action (the "Chan Declaration").[11]

Set forth below is a summary of the evidence presented in support of and in opposition to Plaintiffs' motion followed by the Court's conclusions with respect to this ground for the motion.

### 1. Plaintiffs' Evidence

#### a. Exhibit D (Ayala Declaration)

The Ayala Declaration stated that the RIAA is a trade association whose members represent the vast majority of owners of copyrights for sound recordings in the United States. One of the functions of the RIAA is to assist members in protecting their copyrights. To that end, it investigates unauthorized duplication and distribution of copyrighted sound recordings. Ayala declared that California law requires CD manufacturing plants located within the state to place a mark on each disc that identifies the manufacturer. In 1997–98, RIAA representatives conducted investigations that included purchasing CDs from street vendors and commercial establishments. Based on these investigations, they determined that Media Group was making unauthorized copies of sound re-

9. All of the exhibits are authenticated by the Declaration of Wayne R. Terry ("Terry"), Plaintiffs' attorney in this action and in the Copyright Infringement Action.

10. The RIAA is a trade association whose members own or control the copyrights for over ninety percent of all "legitimate" sound

recordings produced, manufactured, or distributed in the United States.

11. Plaintiffs moved to strike the Supplemental Chan Declaration as untimely. The Court declined to do so and instead offered the Plaintiffs additional time to respond. They declined this offer.

cordings subject to copyrights owned by RIAA members.

As a result, Ayala stated, in 1998, he contacted Media Group and met with some of its employees. He discussed with them the need to screen customer orders to make certain that their customers owned the copyrights for the sound recordings they wanted duplicated or were authorized by the owners to copy them. The RIAA has developed an educational program for instructing manufacturers how to spot replication orders that pose an infringement risk. The RIAA conducted such a program at the Media Group plant three times: i.e., on December 4, 1996, February 19, 1998, and April 20, 1999. Ayala participated in all three seminars. At those seminars, the employees in attendance were shown infringing CDs manufactured at Media Group which the RIAA representatives had obtained through their investigations.

Ayala stated that he and the other RIAA representatives advised the Media Group employees to view with suspicion a replication order from someone other than a major record company for a CD containing the performance of a well known recording artist. He declared that such artists are almost always signed to exclusive contracts with major companies. The RIAA representatives told the employees that, if they questioned an order, they could call the RIAA to obtain a determination of whether the replication would constitute copyright infringement. A toll free number was provided. They also advised the Media Group employees that obtaining an indemnification agreement from the customer was not sufficient to protect against copyright infringement.

Ayala stated that, after the third seminar, on December 8 through 10, 1999, he

and other representatives of the RIAA conducted an audit at the Media Group plant. They took away hundreds of suspicious CDs. Further investigation revealed that most of the removed CDs violated their members' copyrights. A second audit was conducted from November 8 through 10, 2000. Again, their investigations revealed hundreds of CDs that violated their members/ copyrights. Many of the CDs recovered as a result of both audits were recordings of some of the biggest hits by some of the country's biggest artists.

The Copyright Infringement Action was filed on June 7, 2000. Ayala declared that, through its continued investigations, since filing that action, the RIAA has discovered hundreds of additional infringing CDs manufactured by Media Group. By reference to the numbers assigned by Media Group to their CDs, they are able to establish that approximately 126 of the infringing sound recordings were manufactured after November 2000.

### b. Exhibit H (Pagnanelli Declaration)

There are twenty exhibits attached to the Pagnanelli Declaration. Of these, Exhibits 2, 4, 8, 12, 17, 18, 19, and 20 contain evidence supporting Plaintiffs' motion.

**Exhibit 2.** Exhibit 2 consists of Media Group's responses to the Plaintiffs' First Set of Interrogatories.[12] Interrogatory No. 1 asked Media Group to identify each of the Plaintiffs' recordings that it has ever claimed the right to duplicate. Interrogatory No. 2 asked Media Group to set forth all facts relating to the basis for this claim. In its response to Interrogatory No. 1, Media Group stated that it "believed in good faith that it had the right to duplicate all of plaintiff's recordings that are the

---

**12.** The interrogatories are set forth in Exhibit 1 since they are not repeated in Exhibit 2.

subject matter of this lawsuit." In answer to Interrogatory No. 2, Media Group stated that "Obtaining of indemnification agreements, good faith belief that we were following the training and guidance of RIAA, good faith belief in representations made by customers that they had appropriate licensing to reproduce Plaintiffs' Phonoreords [sic]."

**Exhibit 4.** Exhibit 4 consists of the Debtor's responses to the Plaintiffs' First Set of Interrogatories.[13] Interrogatory No. 6 asked the Debtor to describe his role in the replication of Phonorecords containing any of the Plaintiffs's recordings. In response, the Debtor stated that his "current position as CEO requires that I oversee the entire operation of Media Group. I do not personally take orders or participate in the production process...."

Interrogatory No. 13 asked the Debtor to state all the facts upon which he based his response to any requests for admissions which were not unqualified admissions. In response, with respect to Request Nos. 3, 16, and 21, the Debtor stated that Media Group believed that it was acting in good faith and believed that its customers had the appropriate licensing for the Phonorecords. With respect to Request No. 11, he stated that he was not personally trained by the RIAA.

Interrogatory No. 14, 17, and 20 asked the Debtor to state all the facts supporting his affirmative defenses in his answer.[14] In response to each Interrogatory, the Debtor stated "Indemnification agreements which were suggested by RIAA training. Lack of intent on the part of this defendant to wilfully [sic] infringe the

copyrighted material of plaintiff. The documents for each order that this defendant filled and kept in the ordinary scope of business."

**Exhibit 8.** Exhibit 8 consists of Media Group's responses to the Plaintiffs' First Set of Requests for Admissions.[15] In its response to Requests for Admissions Nos. 1 and 2, Media Group admitted that it had reproduced and caused to be reproduced copies of Plaintiffs' recordings. In response to Request for Admission No. 3, Media Group denied that it had never received a license to do so. However, its only explanation for this response was the language set forth above. In response to Request for Admission No. 11, Media Groupd admitted that it had been trained by representatives of the RIAA on the recognition and avoidance of copyright infringement. In response to Requests for Admission Nos. 12, 16, and 21, Media Group denied that it had, without Plaintiffs' permission, materially contributed to the reproduction of Plaintiffs' recordings.

**Exhibit 12.** Exhibit 12 consists of the Debtor's responses to the Plaintiffs' First Set of Requests for Admissions.[16] The requests for admissions directed to the Debtor are essentially the same as those directed to Media Group, and the Debtor's responses are essentially the same. Request for Admission No. 11 asks the Debtor to admit that he has been trained by representatives of the RIAA. The Debtor responds "Deny." However, the Debtor responds "Admit" to Requests for Admission Nos. 17 and 18, which ask the Debtor to admit that he was in a position to control

---

13. The interrogatories are set forth in Exhibit 3 since they are not repeated in Exhibit 4.

14. The Debtor's Answer is attached to the Pagnanelli Declaration as Exhibit 16.

15. The requests for admissions are set forth in Exhibit 7 since they are not repeated in Exhibit 8.

16. The requests for admission are set forth in Exhibit 11 since they are not repeated in Exhibit 12.

the conduct of Media Group and did exercise control over it.

**Exhibit 17.** Exhibit 17 consists of excerpts from the February 12, 2001 deposition (the "Jin Deposition") testimony of Michael Jin. Jin is identified in Exhibit 19 as the Customer Service Manaer for Media Group. Jin testified that he was employed by Media Group for over three years and was one of the Media Group employees who received training from the RIAA in how to avoid copyright infringement. In his testimony, Jin agreed that he would consider it suspicious to receive an order for duplication of a CD by an extremely popular artist from someone other than a major recording company. However, he stated that they never had time to check on each sound title and that it was not part of the procedure to do so. Sometimes, they didn't even have the title of an album. They might just have a customer part number. He noted that some of the workers were not that familiar with popular music.

Jin stated that they did ask their customers for a listing of the songs on the discs to be replicated as part of their copyright checking. However, more often than not, they didn't receive a listing. He testified that, if they noticed something that was obviously suspicious, they would put the order on hold and check on the customer's right to replicate it. In addition, if they noticed that the CD had a logo of someone other than the customer, they would refuse the order. However, they were not usually looking for a problem and might miss it. It was not part of the procedure to listen to the CDs before replicating them.

Jin testified that, when he started working for Media Group, he received no training in how to avoid copyright infringement. However, he participated in all three subsequent RIAA training sessions. He vaguely recalled being instructed that submission of a small order was identified by the RIAA was a red flag as was a customer's wanting an order shipped on a spindle rather than in a jewel box. However, he was skeptical about this advice applying in their business because they had many small orders and many orders for CDs on spindles. He testified that the RIAA people did not explain why such indicia should raise Media Group's suspicions.

Jin responded in the affirmative to the question of whether he had had any conversations with anyone in management concerning instituting any of the procedures recommended by the RIAA. He testified that, in late 1997 or early 1998, about the time of the first RIAA training, he talked to the Debtor and others about this issue. He stated that he believed that, at the time of the training sessions, the Debtor had an understanding of the need to screen orders for possible copyright infringement. He testified that, after the training, some additional efforts were made to insist that the customers provide copyright information before their discs were replicated.

Jin admitted that Media Group was instructed by the RIAA that indemnification agreements were not adequate substitutes for proof of ownership of copyrights. He admitted that, notwithstanding this instruction, Media Group accepted indemnification agreements for this purpose. He estimated that there should be a few hundred such agreements but was not certain where those agreements were located. He stated that indemnification agreements were mainly used in opening an account for a new customer.

In response to the question whether Media Group would stop pressing for a customer that gave them an infringing order, he responded "I wouldn't think so." They would just refuse the order but would

process other orders that did not appear suspicious. He testified that, when Media Group received a suspicious order, they would not always contact the RIAA to check because would take too much time.[17] They would either ask the customer for copyright information or send the order back.

Jin testified that, for Media Group, the main red flags would be failure to provide copyright information, missing song list, or suspicious artwork. He admitted that, to some extent, Media Group failed to follow the indicators that RIAA set out in its training session. Jin admitted that Media Group would have replicated fewer infringing CDs if it had followed RIAA's instructions.

**Exhibit 18.** Exhibit 18 consists of a letter dated November 10, 1999 from Stanley Pierre–Louis ("Pierre–Louis") to the Debtor.[18] In the letter, Pierre–Louis identified himself as counsel for the RIAA. He informed the Debtor that the RIAA had gathered substantial evidence that Media Group had engaged in repeated acts of copyright infringement involving sound recordings. He stated that the letter was written to attempt to resolve the problem without litigation. The letter stated that Media Group's conduct had been particularly egregious because many of the infringing discs discovered involved compilations of the biggest hits from some of the top performers in the recording industry.

The letter noted that the RIAA had conducted three training seminars at the Media Group plan. However, it appeared from the RIAA's investigations that Media Group had failed to implement even the most rudimentary safeguards to prevent CD piracy. The letter conceded that Media Group had on occasion brought infringing order to the RIAA's attention. However, this has been the exception rather than the rule.

**Exhibit 19.** Exhibit 19 consists of a letter dated November 11, 1999 in response to Exhibit 18. As noted above, it was prepared by Jin and approved by the Debtor. The letter stated that the Debtor was "deeply concerned" about the statements made in Pierre–Louis's letter. It stated that, for the past four years, Media Group had been working with the RIAA to avoid copyright infringement. The Debtor expressed his shock that the RIAA had discovered as many as over 150 pirated titles connected to Media Group. He agreed that this indicated that Media Group's internal measures controlling copyright verification had not been effective. He asked for more detailed information about the titles so that Media Group could improve its procedures. In the mean time, he advised the RIAA that Media Group intended to stop replicating music titles beginning the next month.

**Exhibit 20.** Exhibit 20 consists of the report (the "Creighton Report") of the Plaintiffs' expert witness, Francis Creighton ("Creighton"). In his report, Creighton identified himself as the Senior Vice President and Director of the Anti–Piracy Unit for the RIAA. He stated that he had

---

17. The Supplemental Chan Declaration, the Debtor noted that Plaintiffs have never taken his deposition. He noted that the district court in the District Court Order had ascribed to him the statement that Media Group did not call the RIAA to check on suspicious orders because it would have been a waste of time. He declared that he had never made any such statement.

18. At his deposition, Jin testified that he discussed this letter with the Debtor and that the Debtor asked him to prepare a response to it. He testified that he showed the proposed response to the Debtor and that the Debtor approved the letter before it was sent.

supervised visits to over 100 CD manufacturing plants and participated in numerous training sessions on ways to avoid piracy of copyrighted sound recordings. He stated that he had reviewed the complaint in the copyright infringement action as well as the Jin Deposition, the training materials provided to Media Group by the RIAA, and the infringing CDs manufactured by Media Group. A copy of the training materials was attached to the Creighton Report.

Creighton stated that CD plants are instructed to secure documentation from their customers establishing valid proof of copyright ownership or licensing and to pay special attention to orders for small quantities, particularly for recordings by popular artists. The seminars also highlight other indices of piracy, such as product packaging with no artist listing or graphics, misspellings of the artist's name or song title on the CD or packaging. Based on his review of the evidence, Creighton stated that he had concluded that Media Group had repeatedly and willfully infringed the reproduction rights of RIAA members on thousands of occasions. The infringing CDs were either obtained from the Media Group facility or contained their id numbers.

His conclusion that the infringement was willful is based on the fact that Media Group received training on three separate occasions over a period of five years. The Media Group employees who attended the session were those managers with direct responsibility for the production of the CDs. Media Group was even warned that it was coming dangerously close to a lawsuit. Nevertheless, Media Group failed to incorporate Media Group's recommended practices into their procedures. Within six months of the RIAA's third training session, they uncovered over 150 pirated CDs. Since November 1999, the RIAA had obtained over 500 more pirated CDs manufactured by Media Group.

Creighton stated that the indicia of piracy were clear from a cursory look at the pirated discs. Many of them lacked any copyright ownership information or attributed ownership to unknown companies. Many lacked a listing of the artist, misspelled the name of the artist or the song title, had poor graphics, or contained incorrect or misleading information. Many of the discs contained compilations of the biggest hits from some of the top performers in the recording industry: for example, James Brown, The Doors, The Eagles, and Ricky Martin. Media Group should have been suspicious of orders for works by these artists by someone other than an established record company. Creighton concluded from his review of the Jin testimony that Media Group turned a blind eye toward evidence of infringement. He stated that this was one of the most egregious cases of copyright piracy that he had seen in his 16 years working in the industry.

### 2. Debtor's Evidence

As noted above, the Supplemental Chan Declaration attached a copy of a declaration by Chan filed in the Copyright Infringement Action: i.e., the Chan Declaration. In the Chan Declaration, the Debtor stated that he was the CEO of Media Group which had been in existence since 1995. He stated that, from November 1999, Media Group and he had endeavored to cooperate with the RIAA to resolve the infringement problem. He stated that he had twice opened Media Group's doors for audit. In addition, there were earlier training sessions conducted by the RIAA on the Media Group premises. He asserted that most of the infringing took place before the training. In the Chan Declaration, the Debtor stated that Media Group had had a turnover of personnel in the

sales department. As a result, not all of the sales employees had been adequately trained. The Debtor declared that Media Group had never intentionally set out to pirate music titles. In fact, it has ceased to replicate music CDs because of the problems they presented. He stated that he also believed, in good faith, that indemnifications agreements from customers were sufficient evidence of the customers' ownership of the copyrights.

Finally, the Debtor declared that, if he had intended to violate the law, Media Group would not have been become so rooted in the community where its plant was located. Moreover, he would not placed Media Group's identifying mark on the CDs so that they could be traced back to Media Group.

In the Supplemental Chan Declaration, the Debtor repeated many of these statements. In addition, he noted that, from 1996 to 2000, Media Group replicated over one hundred thousand titles of songs. In the Copyright Infringement Action, Plaintiffs only alleged that Media Group produced 1,500 infringing CDs. This represented only .015% of Media Group's total output. He noted that Media Group had designated certain employees to verify customers' ownership of copyrights or licenses. Their failure to do this adequately was, at most, the result of lack of management and oversight but was not a deliberate act to injure the RIAA.

### 3. Conclusions

#### a. Willfulness

██ As discussed above, to establish the right to except a judgment debt from an individual chapter 7 debtor's discharge under 11 U.S.C. § 523(a)(6), one of the two things a creditor must establish is that the debtor's conduct was willful. Willfulness, in this context, means that the debtor committed: (1) an intentional act that resulted in the creditor's injury and (2) either intended the injury to occur or was substantially certain that it would occur. The first of these two prongs is easily satisfied. The undisputed evidence is that Media Group replicated CDs on numerous occasions over a period of years for customers who did not hold the copyrights or licenses to copy the CDs. It is also undisputed that this resulted in substantial damages to Plaintiffs. The Debtor has admitted that he was the CEO of Media Group, was in a position to control its operations, and actually exercised control. Thus, Media Group's conduct may be ascribed to the Debtor.

██ As discussed above, the second prong is governed by a subjective standard: i.e., what the Debtor intended or was substantially certain would occur, not what a reasonable person would have intended or would have been substantially certain would occur. However, as with a fraud claim, actual intent or substantial certainty need not be admitted by the Debtor. It may be inferred from all the facts and circumstances established. *In re Jacks*, 266 B.R. 728, 742 (9th Cir. BAP 2001).

Plaintiffs do not contend that the Debtor intended to injure them. Instead, they contend that the Debtor's subjective substantial certainty should be inferred from the undisputed evidence presented. The Court agrees. The undisputed evidence is that the RIAA conducted three seminars over a period of -years during which they instructed the Media Group employees how to spot CD replication orders that posed a risk of infringement. They gave them a toll free number to call to check who owned the copyright to the sound recording. They warned them that indemnification agreements were not adequate

evidence of copyright ·ownership.[19] Despite the evidence provided by the RIAA of past infringing activities and the instruction provided in how to avoid such activity in the future, the undisputed evidence· is that Media Group made no change in its production procedures. The Debtor offered no conflicting evidence on any of these points.

The Debtor noted that he did not attend the training and did not take customer orders or actually produce the CDs. This is irrelevant. He admitted that he was the CEO, was in charge of Media Group's operations, and actually exercised control over them. He admitted knowing about the problem. Although he professed good faith belief that Media Group was complying with the RIAA recommendations and that he could rely on the indemnification agreements, he provided no basis for either statement. He did not identify a single change in Media Group's procedures as a result of the RIAA training. As noted above, for example, Jin stated that it was not part of Media Group's procedures to call the RIAA about a suspicious order.

The Debtor also professed that his failure to require adequate procedures for screening orders amounted to nothing more than negligence. This assertion might have been persuasive if the RIAA had come to Media Group only once with evidence of infringing discs and had only conducted one training session. However, the Debtor's failure to take any remedial steps after three such instances cannot be ascribed to negligence. Consequently, the Court concludes that there is no genuine issue of fact and the Plaintiffs are entitled to a summary adjudication that the Debtor's conduct was willful.

### b. Malice

As discussed above, to establish the right to except a judgment debt from an individual chapter 7 debtor's discharge under 11 U.S.C. § 523(a)(6), a creditor must also establish that the debtor's conduct was malicious. To establish malice, a creditor must prove that the act was: (1) wrongful, (2) intentional, (3) necessarily caused injury, and (4) was done without just cause or excuse. This test is objective. Plaintiffs' right to a summary adjudication of this element of the claim as well necessarily follows from the Court's conclusion on the willfulness.

▮▮▮▮▮▮ The first three elements of malice are easily established by the undisputed evidence. Media Group acted intentionally in replicating discs· containing sound recordings. It was wrongful to replicate the discs containing sound recordings protected by copyrights owned by others than the customers who ordered the replication. The replication of those discs caused injury to the true owners of the copyrights. As the person in a position to control Media Group's activities and who actually exercised control, the Debtor was responsible for Media Group's conduct. Thus, the only question is whether the Court considers just the Debtor's excuses for Media Group's conduct. As is clear from its discussion of willfulness, the Court does not.

### CONCLUSION

Plaintiffs are entitled to summary judgment against the Debtor excepting the Judgment Debtor from the Debtor's discharge under 11 U.S.C. § 523(a)(6). Their right is not based on collateral es-

---

**19.** The Debtor did state that the indemnification agreements were suggested by the RIAA training. This statement is ambiguous. It could mean that he got the idea of asking for indemnification agreements from the RIAA training even though the trainers stated that they were not an adequate substitute for proof of copyright ownership or license.

toppel grounds. None of the claims upon which the Judgment is based presented a sufficiently identical issue to support the application of that doctrine. However, the undisputed evidence presented in this adversary proceeding does compel judgment for Plaintiffs as a matter of law. The evidence presented by the Debtor is irrelevant, ambiguous, or conclusory and self-serving. It is not sufficient to create a genuine issue of material fact. Counsel for Plaintiffs are directed to submit a proposed form of judgment in accordance with this decision.