**In re Scott William WRIGHT, Debtor.**

**Choice Hotels International, Inc., Plaintiff,**

**v.**

**Scott William Wright, Defendant.**

**Bankruptcy No. RS 05–13967 PC. Adversary No. RS 05–01301 PC.**

United States Bankruptcy Court, C.D. California, Riverside Division.

Oct. 24, 2006.

Robert H. Brumfield, III, Kronick, Moskovitz, Tiedemann & Girard, Bakersfield, CA, for Plaintiff, Choice Hotels International, Inc.

Scott William Wright, Riverside, CA, Pro se.

## MEMORANDUM DECISION

PETER H. CARROLL, Bankruptcy Judge.

Plaintiff, Choice Hotels International, Inc. ("Choice Hotels") seeks a summary judgment against Defendant, Scott William Wright ("Wright") declaring its debt non-dischargeable under § 523(a)(6) of the Code.[1] The court, having considered the pleadings, evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[2] pursuant to Fed.R.Civ.P. 52, as incorporated

---

1. Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub.L. 109–8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

2. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

into adversary proceedings in bankruptcy cases by Fed. R. Bankr.P. 7052.

## I. STATEMENT OF FACTS

Choice Hotels, a Delaware corporation, is one of largest hotel franchise companies in the world. Choice Hotels' franchisees own and operate over 4,500 hotels, inns and resorts in 45 countries under various names, including COMFORT INN®, COMFORT SUITES®, QUALITY INN®, CLARION®, SLEEP INN®, RODEWAY INN®, ECONO LODGE® and MAIN-STAY SUITES®. With respect to its COMFORT® inns, hotels and suites, Choice Hotels owns certain trademarks (collectively, "the COMFORT® marks") which are registered with the United States Patent and Trademark Office and used by Choice Hotels in advertising and marketing its COMFORT® accommodations and services.[3] Choice Hotels provides its franchisees with reservation services. COMFORT® customers can make a reservation with any of Choice Hotels'

franchisees either on the Internet[4] or by using one of Choice Hotels' toll-free telephone numbers.[5]

Sometime in 1988, Wright began working with his father, Elmer Clifford Wright, manufacturing and selling footwear under the name "Happy Feet—The World's Most Comfortable Shoe" ("Happy Feet"). At the time, Happy Feet was operated by Dreamco International, d/b/a Dreamco International, Inc. ("Dreamco"), a California corporation, with its principal place of business in Corona, California.[6] In 1990, Dreamco acquired the right to use the toll-free number 1–800–266–3678, or "1–800–COMFORT," in conjunction with Happy Feet. Wright boasted that the telephone number was placed on "every pair of shoes we made and every piece of literature" concerning their business.[7] Immediately after acquiring the toll-free number, Wright began receiving telephone calls from COMFORT® customers seeking hotel reservations.[8] Initially, Wright simply

---

**3.** The COMFORT® marks include: (1) COMFORT INNS®, No. 1265290, registered on January 24, 1984; (2) COMFORT INN®, No. 1315180, registered on January 15, 1985; (3) COMFORT INN®, No. 1448467, registered on July 21, 1987; (4) COMFORT INN & Design®, No. 1316274, registered on January 22, 1985; (5) COMFORT INN & Design®, No. 1516053, registered on December 9, 1988; (6) COMFORT SUITES & Design®, No. 1405351, registered on August 12, 1986; (7) COMFORT & Design®, No. 1522980, registered on January 31, 1989; (8) COMFORT SUITES®, No. 1712482, registered on September 1, 1992; (9) COMFORT HOTEL & Design®, No. 1707467, registered on August 11, 1992; (10) COMFORT HOTEL®, No. 1712481, registered on September 1, 1992; (11) COMFORT®, No. 1788677, registered on August 17, 1993; (12) COMFORT INN & SUITES®, No. 2264702, registered on July 27, 1999, and (13) CS COMFORT SUITES & Design®, No. 2665525, registered on December 24, 2002.

**4.** Choice Hotels owns the following internet domain names which incorporate the

COMFORT® marks: comfortinn.com, comfortinns.com, comfortsuite.com, comfortsuites.com, comforthotel.com, comforthotels.com and choicehotels.com.

**5.** Choice Hotels provides the following toll-free numbers for direct access to COMFORT INN® and COMFORT SUITES® reservation and information services: 1–800–4–CHOICE and 1–800–228–5150.

**6.** Between 1988 and 1996, Dreamco's sole shareholder was Elmer Clifford Wright. Wright became the sole shareholder of Dreamco in 1996.

**7.** Declaration of Scott Wright in Opposition to Plaintiff's Motion for Summary Judgment, p. 1, l.29 to p. 2, l.1.

**8.** Wright admits that "[w]e were getting **thousands** of phone calls requesting Comfort products and services with a majority requesting the Comfort Inn for hotel reservations." *Declaration of Scott Wright in Opposition to Plaintiff's Motion for Summary Judgment*, p. 2, l.3–4.

advised the COMFORT® customers that they had reached an incorrect number. As the volume of calls increased, however, Wright decided to diversify his business interests and seek opportunities in the travel service industry.

In 1996, Wright struck a deal with ANZ Travel ("ANZ"), an independent travel agent, pursuant to which ANZ would make reservations for COMFORT® customers calling the "1–800–COMFORT" number. In consideration therefor, Wright was paid a portion of the 10% commission received by ANZ under an existing travel service agreement with Choice Hotels. Wright contends that ANZ booked approximately $1.2 million in room reservations with Choice Hotels for COMFORT INN® and COMFORT SUITES® properties by September 1997, using the "1–800–COMFORT" number.

On September 12, 1997, Choice Hotels terminated its travel service agreement with ANZ for "unauthorized use of the Choice COMFORT® trademark" in the telephone number "1–800–COMFORT" used to promote ANZ's travel services.[9] On October 27, 1997, Choice Hotels learned directly from Wright that Dreamco, not ANZ, owned the "1–800–COMFORT" telephone number. On December 2, 1997, Choice Hotels rejected Wright's overtures concerning use of the "1–800–COMFORT" number under an independent travel service agreement between Choice Hotels and Dreamco, and demanded that Wright, Dreamco and ANZ permanently cease using the 1–800–COMFORT number for travel industry related services.

For the next fourteen months, Wright continued to pursue an agreement with Choice Hotels for use of Dreamco's 1–800–COMFORT telephone number in conjunction with Choice Hotels' COMFORT® reservation services. During such period, Wright limited his use of Dreamco's 1–800–COMFORT number to shoe sales through Happy Feet.[10] Wright persisted despite the fact that his efforts to negotiate a deal were repeatedly rejected by Choice Hotels.

Between October 2001 and April 2002, Wright registered the domain names "comfortcallcenter.com" and "1–800–comfort.com." On August 7, 2002, Wright incorporated Comfort Call Center, Inc. ("CCC") under the laws of the State of Nevada,[11] and drafted a business plan for CCC aimed at profiting from the COMFORT® marks through his new websites and reservation hotline. CCC's business plan provided, in pertinent part:

> Paragraph 1.0, under the heading "Executive Summary:" "The Comfort Call Center will be a full service Contact and Reservation center. . . . Our primary focus will be the hotel industry with Comfort Inns and Comfort Inns & Suites."

> Paragraph 1.2, under the heading "Mission:" "Comfort Call Center . . . will function primarily as a Contact/Reservation center for the owners and sole proprietors of Comfort Inns and Comfort Inns & Suites. . . ." CCC's "[m]ain objective is to build our brand name 1–800–COMFORT."

> Paragraph 1.3, under the heading "Keys to Success" and subheading "Solid Customer Base:" Choice Hotels has "1,800

**9.** Declaration of Paul C. Jorgensen in Support of Plaintiff's Motion for Summary Judgment, p. 1, l. 12–16.

**10.** Happy Feet ultimately ceased doing business in 2000.

**11.** On November 11, 2003, CCC was registered to do business in the State of California.

hotels in full operation and another 400 under construction" under the COMFORT INN® and COMFORT INN & SUITES® marks.

Paragraph 1.3, under the subheading "Online Presence:" CCC states its intent to use the "1–800–COMFORT.COM" mark and domain name "to direct thousands of people to our website . . . ."

Paragraph 4.0, under the heading "Market Analysis Summary:" 'COMFORT INN® and COMFORT INNS & SUITES®' are "our primary target." [12]

In December 2002, CCC registered the following domain names: "1–888–comfort.com," "comfortgoldcard.com," "comfortsilvercard.com," "comfortbronzecard.com" and "comfortowners.com." The domain names registered by Wright and CCC provided access to two websites authored and designed by Wright which specifically referred to Choice Hotels' COMFORT® marks, COMFORT INNS® and COMFORT INNS & SUITES®. By 2003, Wright and CCC were soliciting business directly from Choice Hotels' franchisees for the call center and websites. Wright admits sending approximately 2,000 facsimile solicitations to owners of COMFORT INNS® and COMFORT INNS & SUITES®, asking that they visit his websites and utilize CCC's call center and reservation services using the 1–800–COMFORT number and CCC domain names and marks (collectively, the "Infringing marks" or "Infringing domain names"). At no time did Choice Hotels consent to use of the COMFORT® marks or the Infringing marks by either Wright, Dreamco or CCC.

On May 29, 2003, Choice Hotels filed a complaint against Wright, Dreamco and CCC in Case No. CV–03–3785–RGK, styled *Choice Hotels International, Inc. v. Scott Wright, et. al.,* in the United States District Court, Central District of California, seeking an injunction and damages for their unauthorized use of its Comfort® marks. Wright, who was represented by counsel, filed an answer to the complaint on June 19, 2003. On August 19, 2003, the district court entered a preliminary injunction enjoining Wright, Dreamco and CCC from using the COMFORT® marks and advertising or marketing the 1–800–COMFORT number. On August 27, 2003, the court set the matter for a jury trial to begin on May 11, 2004.

On February 25, 2004, after a discovery period of approximately seven months,[13] Choice Hotels filed a motion for summary judgment. On April 6, 2004, Choice Hotel's motion was taken under submission by the court. Wright waited until April 9, 2004, to file a response and supporting declaration in opposition to Choice Hotels' motion for summary judgment. Choice Hotels objected to Wright's response as untimely, but its motion to strike was denied on April 14, 2004. On April 20, 2004, the district court entered an order granting Choice Hotels' motion for summary judgment. On May 11, 2004, the district court entered a judgment against Wright, Dreamco and CCC, jointly and severally, permanently enjoining the defendants from using the COMFORT® marks and

---

**12.** Statement of Uncontroverted Facts in Support of Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 5, l.21 to p. 6, l.11.

**13.** Prior to expiration of the discovery deadline on February 5, 2004, Choice Hotels served Wright with requests for admission pursuant to Rule 36 of the Federal Rules of Civil Procedure and took his testimony by oral deposition pursuant to Rule 30 of the Federal Rules of Civil Procedure. Choice Hotels also obtained the oral deposition of Wright's father, Elmer Clifford Wright, on January 6, 2004.

the Infringing marks, and awarding Choice Hotels the sum of $45,720 in royalty fees for their unauthorized use of the COMFORT® marks and statutory damages totaling $525,000 pursuant to the Anticybersquatting Consumer Protection Act ("ACPA").[14]

On April 21, 2005, Wright filed a voluntary petition under chapter 7 of the Code. Choice Hotels was listed in Schedule F as the holder of an unsecured, non-priority claim in the amount of $570,720 by virtue of the judgment entered in the district court. On July 25, 2005, Choice Hotels timely commenced this adversary proceeding seeking a determination that the federal district court judgment for $570,720, plus interest, is excepted from discharge pursuant to § 523(a)(6) of the Code.

## II. DISCUSSION

■■■ This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is appropriate in this court. 28 U.S.C. § 1409(a). To prevail under § 523(a)(6), the plaintiff must establish the allegations of the complaint by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Jett v. Sicroff*

*(In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir.2005). Objections to the dischargeability of a debt are to be literally and strictly construed against the objector and liberally construed in favor of the debtor. *See Quarre v. Saylor (In re Saylor)*, 108 F.3d 219, 221 (9th Cir.1997); *Hayhoe v. Cole (In re Cole)*, 226 B.R. 647, 653 (9th Cir. BAP1998).

### A. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[15] The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir.1994).

Under Rule 56(c), the moving party bears the initial burden of establishing that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

**14.** Pub.L. No. 106–113, 113 Stat. 1536 (1999), codified at 15 U.S.C. § 1125(d).

**15.** Rule 56 of the Federal Rules of Civil Procedure, applicable to adversary proceedings by virtue of Rule 7056, provides for the summary adjudication of issues:

**(c) Motion and Proceedings Thereon** ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ...

...

**(e) Form of Affidavits; Further Testimony; Defense Required** ... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(c) & (e).

(1986). "A 'material fact' is one that is relevant to an element of a claim or defense or whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense." *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). Genuine issues of material fact are those "factual issues that make a difference to the potential outcome and 'that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Svob. v. Bryan (In re Bryan),* 261 B.R. 240, 243 (9th Cir. BAP2001) (*quoting Anderson,* 477 U.S. at 250, 106 S.Ct. 2505). In other words, a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Choice Hotels, as the movant, has the initial burden of production to establish that there is no genuine issue as to any material fact and that it is entitled to a summary judgment as a matter of law. Choice Hotels' burden of production is also affected by its burden of persuasion. When the movant has the ultimate burden of persuasion, the movant must submit evidence establishing that it is entitled to judgment as a matter of law even in the absence of an adequate response by the nonmovant. *See, e.g., N. Slope Borough v. Rogstad (In re Rogstad),* 126 F.3d 1224, 1227 (9th Cir.1997) (stating that it is error to grant a motion for summary judgment simply because there is no opposition); *Henry v. Gill Indus., Inc.,* 983 F.2d 943, 950 (9th Cir.1993) (observing that summary judgment is improper where the moving papers are insufficient to support the motion or on their face reveal a genuine issue of material fact); *Hoover v. Switlik Parachute Co.,* 663 F.2d 964, 967 (9th Cir.1981) (stating that even in the absence of evidence in support of the opposition, summary judgment should not be granted if the evidence in support of the motion is insufficient).

Once the moving party's burden is met by presenting evidence which, if uncontroverted, would entitle the moving party to a directed verdict at trial, the burden then shifts to the respondent to produce "significantly probative evidence" of specific facts showing there is a genuine issue of material fact requiring a trial. *T.W. Elec. Serv.,* 809 F.2d at 630, *citing First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The respondent "will not be able to withstand a motion for summary judgment merely by making allegations; rather, the party opposing the motion must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial." *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002). A mere "scintilla" of evidence supporting the respondent's position will not be sufficient. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

In deciding whether a fact issue has been created, the court must view the facts and the inferences to be drawn therefrom in a light most favorable to the nonmoving party. *See Jonas v. Resolution Trust Corp. (In re Comark),* 971 F.2d 322, 324 (9th Cir.1992). All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Inferences may also be drawn from underlying facts that are not in dispute. *T.W. Elec. Serv.,* 809 F.2d at 631. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. *Willful and Malicious Injury*

■ Section 523(a)(6) of the Code excepts from discharge debts resulting from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). A "deliberate or intentional injury" is required before § 523(a)(6) will render a debt nondischargeable. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (stating that nondischargeability under § 523(a)(6) "takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury").

■ Section 523(a)(6) requires separate findings on the issues of "willful" and "malicious." The "willful" injury requirement of § 523(a)(6) is met "when it is shown either that the debtor had a subjective motive to inflict injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct." *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir.2002) (quoting *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir.), *cert. denied*, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001)). A "malicious injury" involves "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Id.* at 1146–47 (quoting *Jercich*, 238 F.3d at 1209). *See, e.g., Diamond v. Kolcum (In re Diamond)*, 285 F.3d 822, 829 (9th Cir. 2002) (holding that a state court jury finding that the debtors "intentionally caused injury" to the creditor "without just cause" was entitled to preclusive effect for purposes of § 523(a)(6)); *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791 (9th Cir.1997) (en banc) (stating that malice under § 523(a)(6) "does not require a showing of biblical malice, *i.e.*, personal hatred, spite or ill-will").

### C. *Issue Preclusion*

Choice Hotels asserts that it is entitled to a summary judgment on its § 523(a)(6) claim given the preclusive effect of the summary judgment entered by the district court in the prior lawsuit between the parties. While conceding that bad faith or intent were not essential elements of its causes of action in the district court,[16] Choice Hotels claims that the district court's findings with respect to Wright's violation of the ACPA satisfy the "willfulness" and "maliciousness" requirements of § 523(a)(6). Wright disagrees, arguing that the issues of "willfulness" and "maliciousness" were not "raised, actually litigated or necessary" to either Choice Hotels' claims in the prior action

---

16. Fraudulent or wrongful intent is not an essential element of unfair competition or infringement of a registered trademark. *See, e.g., Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1132 n. 12 (9th Cir. 1998) (stating that "[a]bsence of malice is no defense to trademark infringement"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir.1993) (observing that "[a] party claiming trademark infringement need not demonstrate that the alleged infringer intended to deceive consumers"); *U–Haul Int'l, Inc. v. Jartran, Inc.*, 522 F.Supp. 1238, 1254 (D.Ariz.1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982) (stating that "[i]ntent to confuse or mislead is not an element of a cause of action under the Lanham Act"). In *S.C. Johnson & Son, Inc. v. Johnson*, 266 F.2d 129 (6th Cir. 1959), the Sixth Circuit observed:

> While fraudulent intent is not an essential element of infringement of a trademark, it is entitled to consideration. Motivation is an important factor in the determination of such an issue. Trademark infringement does not depend upon a fraudulent intent; and good faith is no defense, if the mark used is likely to result in confusion or mistake. But the court has the right, in determining the likelihood of confusion, to consider the motive of the party who adopts the mark.

*Id.* at 142 (citations omitted).

or the judgment entered in the case. Wright also reasons that none of the issues were "actually litigated" in the previous suit because he neither conducted discovery nor timely opposed Choice Hotels' motion for summary judgment.

■ Collateral estoppel, or issue preclusion,[17] applies to nondischargeability proceedings in bankruptcy court. *Grogan*, 498 U.S. at 284 n. 11, 111 S.Ct. 654; *Cal–Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1123 (9th Cir.2003); *Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817, 824 (9th Cir.BAP2006). Issue preclusion prevents a party from relitigating an issue that the party has actually litigated and lost in a prior proceeding. *See R.T.C. v. Keating*, 186 F.3d 1110, 1114 (9th Cir. 1999); *Roussos v. Michaelides (In re Roussos)*, 251 B.R. 86, 92 (9th Cir. BAP2000). Issue preclusion serves to protect litigants from multiple lawsuits, conserve judicial resources, and encourage reliance on adjudication by reducing the likelihood of inconsistent decisions. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). *See generally*, C. Klein, *et. al., Principles of Preclusion and Estoppel in Bankruptcy Cases*, 79 Am. Bankr.L.J. 839, 852–58 (2005).

■ The preclusive effect of a prior federal district court judgment is determined by federal law. *See, e.g., Fed. Deposit Ins. Corp. v. Daily (In re Daily)*, 47 F.3d 365, 368 (9th Cir.1995) (applying federal law to determine the preclusive effect of a prior federal judgment in an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO")); *Robi*, 838 F.2d at 322 (stating that "we apply California law of *res judicata* to the California judgment, New York law to the New York judgment, and federal law to the federal judgments"); *Genel Co. v. Bowen (In re Bowen)*, 198 B.R. 551, 555 (9th Cir.BAP1996) (stating that "we apply federal law to determine the preclusive effect of a prior federal diversity judgment"). Under federal law, issue preclusion may be raised offensively[18] when "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party

---

17. In *Robi v. Five Platters, Inc.*, 838 F.2d 318 (9th Cir.1988), the Ninth Circuit explained the concepts of issue preclusion and claim preclusion, stating:

> Generally, the preclusive effect of a former adjudication is referred to as *"res judicata."* The doctrine of *res judicata* includes two distinct types of preclusion, claim preclusion and issue preclusion. Claim preclusion treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same claim or cause of action. Claim preclusion prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in a prior proceeding.
>
> The doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding. In both the offensive and defensive use situations the party against whom estoppel [issue preclusion] is asserted has litigated and lost in an earlier action. The issue must have been actually decided after a full and fair opportunity for litigation.

*Id.* at 321–22 (citations and quotations omitted).

18. "[O]ffensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

or in privity with a party in the previous action." *U.S. Internal Revenue Serv. v. Palmer (In re Palmer)*, 207 F.3d 566, 568 (9th Cir.2000); *Pena v. Gardner*, 976 F.2d 469, 472 (9th Cir.1992).

■ Issue preclusion may apply despite the fact that the prior determination is based upon an unopposed motion for summary judgment rather than a trial. *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 712 (Fed.Cir.1983); *U.S. v. Gottheiner (In re Gottheiner)*, 703 F.2d 1136, 1140 (9th Cir.1983). In such a case, the "actual litigation" requirement is satisfied if the party had a full and fair opportunity to litigate the issue in the prior proceeding and, despite substantial participation in the action, chose not to do so. *See, e.g., Palmer*, 207 F.3d at 569 (holding that a summary judgment obtained by the IRS against the debtor in a prior Tax Court proceeding, which had been abandoned at the outset by the debtor, had no preclusive effect in a subsequent action under § 523(a)(1)(C)); *Daily*, 47 F.3d at 368 (holding that a default judgment entered against the debtor as a discovery sanction, after two years of active participation in the litigation, was entitled to preclusive effect in a subsequent dischargeability proceeding between the parties); *Gottheiner*, 703 F.2d at 1140 (holding that collateral estoppel was available to a creditor who obtained an unopposed summary judgment after sixteen months of active participation by the debtor).

There is no dispute that some of the essential elements of issue preclusion under federal law are present in this case. Choice Hotels and Wright were parties to the prior district court action. The issues litigated in the district court, which form the basis for Choice Hotels' § 523(a)(6) claim against Wright in this proceeding, involved Wright's liability, if any, to Choice Hotels for alleged service mark infringement, unfair competition, service mark dilution, and registration of the Infringing domain names in violation of the ACPA. Wright actively participated in the lawsuit, and had a full and fair opportunity to litigate these issues in the prior action.[19] Wright lost in the prior action, and the summary judgment entered by the district court against Wright is a final judgment on the merits. To have issue preclusion, however, the issue determined in the prior action must be *identical* to the issue presented in the current action. *Cantrell*, 329 F.3d at 1123 (quoting *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1245 (9th Cir.2001)) (emphasis added).

### D. *Choice Hotels' Summary Judgment*

#### 1. *Service Mark Infringement and Unfair Competition*

■ A service mark is "a distinctive mark used in connection with the sale or advertising of services, such as insurance, while a trademark is typically used to identify and distinguish tangible goods." *Am. Int'l Group, Inc. v. Am. Int'l Bank*, 926 F.2d 829, 830 n. 1 (9th Cir.1991). Service marks are registrable and entitled to protection in the same manner as are trade-

**19.** Wright's contention that the district court did not consider his untimely opposition to Choice Hotels' motion for summary judgment is belied by the record. Wright filed his untimely opposition to Choice Hotels' motion for summary judgment on April 9, 2004. On April 14, 2004, the district court denied Choice Hotels' motion to strike Wright's untimely opposition. An order granting Choice Hotels' motion for summary judgment was not entered until April 20, 2004. Nor is there merit to Wright's assertion that his own failure to conduct discovery before expiration of the court-imposed deadline of February 5, 2004, deprived him of a full and fair opportunity to litigate the issues before the district court.

marks. *Id.; see* 15 U.S.C. § 1053. Choice Hotels sought relief against Wright in the district court for alleged service mark infringement and unfair competition in violation of §§ 32(a) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a), respectively, and state law.[20]

Federal trademark law seeks to protect both an owner's investment in a mark as well as consumers who have formed an association with the mark. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); *Avery Dennison*, 189 F.3d at 873. Liability for trademark or service mark infringement occurs when a person "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

Trademark infringement is established if the plaintiff demonstrates (1) ownership of a valid, protectable mark, and (2) a likelihood of confusion, mistake or deception in the defendant's use of the mark. *See New West Corp. v. NYM Co.*, 595 F.2d 1194, 1198–1202 (9th Cir.1979); *Charles Schwab & Co. v. Hibernia Bank*, 665 F.Supp. 800, 803 (N.D.Cal.1987). "The

core element of trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the marks is likely to confuse customers about the source of the products." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir.1993) (quoting *E. & J. Gallo Winery*, 967 F.2d at 1290). Likelihood of confusion "exists when customers viewing [a] mark would probably assume that the product or service it represents *is associated with the source* of a different product or service identified by a similar mark." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir.1987) (quoting *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1243 (9th Cir.1984)).

In holding that Wright's actions constituted service mark infringement and unfair competition, the district court found that the COMFORT® marks, as federally registered trademarks, were valid, protectable marks owned by Choice Hotels. *See Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir.1999) (stating that "registration of the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of [plaintiff's] exclusive right to use the mark on the goods and services specified in the registration"); *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.1996) (noting that

**20.** Choice Hotels' state law claims included: (a) service mark infringement in violation of Cal. Bus. & Prof.Code § 14340; (b) unfair competition in violation of Cal. Bus. & Prof. Code § 17200; (c) service mark dilution in violation of Cal. Bus. & Prof.Code § 14330; (d) trademark infringement and unfair competition under common law, and (e) unjust enrichment. The liability analysis for trademark infringement and unfair competition is essentially the same under federal, state and common law. *See, e.g., M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir.2005) (stating that "[t]he test for trade-

mark infringement under state, federal, and common law is whether there will be a likelihood of confusion"); *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 874 (9th Cir.1999) (discussing the substantial similarity between California's dilution statute and the Federal Trademark Dilution Act); *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994) (stating that the Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act").

"federal registration of the mark is prima facie evidence that the registrant is the owner of the mark"). Wright offered no evidence to the contrary. Indeed, it was undisputed that Choice Hotels "began using the marks COMFORT®, COMFORT INN® and COMFORT INNS® as early as June 1, 1981, and COMFORT SUITES® at least as early as October 17, 1985, for hotel/motel services, hotel/motel reservation services and related goods and services."[21] After applying the eight factor test promulgated by the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979),[22] the district court further held that a likelihood of confusion existed between the COMFORT® marks and the Infringing marks because:

1. The Infringing marks incorporated the word "comfort" as their dominant term, and the addition of the domain indicator ".COM" or the prefix "1–8—" or "1–888" did nothing to differentiate the Infringing marks from the COMFORT® marks.

2. Choice Hotels and Wright each offered travel reservation services.

3. Choice Hotels and Wright each used the Internet and toll-free numbers to market their services.

4. Choice Hotels had used its COMFORT® mark for over twenty years and had devoted millions of dollars in advertising to make it a prominent name, and research on consumer awareness showed that there was a 97% awareness for the COMFORT INN® brand since 1999 and that awareness for COMFORT SUITES® had arisen from 69% in 1999 to 81% by 2002.

5. Wright admitted to having adopted the Infringing marks for the purpose of trading on the association with the COMFORT® marks.

6. Wright conceded that he received in excess of 330,000 calls annually by consumers looking for COMFORT® hotel information, indicating that consumer confusion existed.

7. Wright intended to create a hotel/motel reservation call center for Choice Hotels' COMFORT®—brand franchisees and to provide services via the Internet and telephone, substantially identical to the travel services offered to COMFORT® customers by Choice Hotels.

Based on the foregoing findings, the district court determined that Wright was liable to Choice Hotels on its claims for

---

21. Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 4, l.7–11.

22. In *Sleekcraft,* the Ninth Circuit identified the following eight nonexclusive factors as relevant in determining likelihood of confusion:
 1. strength of the mark;
 2. proximity of the goods;
 3. similarity of the marks;
 4. evidence of actual confusion;
 5. marketing channels used;
 6. type of goods and the degree of care likely to be exercised by the purchaser;
 7. defendant's intent in selecting the mark; and
 8. likelihood of expansion of the product.

*Id.* at 348–49. *See, e.g., Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1076 (9th Cir.2006) (stating that the *Sleekcraft* factors "are not applied mechanically; courts may examine some or all of the factors, depending on their relevance and importance"); *Surfvivor Media, Inc. v. Survivor Prods.,* 406 F.3d 625, 631 (9th Cir.2005) (explaining that "[t]he test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them"); *Brookfield Commc'ns.,* 174 F.3d at 1054 (opining that some *Sleekcraft* factors "are much more important than others, and the relative importance of each individual factor will be case-specific").

service mark infringement and unfair competition.

 Despite Wright's admission that he "adopted the Infringing marks for the purpose of trading on the association with the COMFORT® marks," the district court made no specific finding that Wright's infringement of the COMFORT® marks was either willful or intentional.[23] It was not necessary to do so. Actual knowledge and wrongful intent are not essential elements of either direct service mark infringement or unfair competition.[24] Whether Wright had actual knowledge of his infringement or the specific intent to siphon off the goodwill of Choice Hotels' COMFORT® marks were issues that were neither actually litigated nor necessary to the district court's summary judgment. Therefore, the judgment in favor of Choice Hotels on such claims in the prior action does not merit issue preclusion in this adversary proceeding. *See Atlantic Recording Corp. v. Chin–Liang Chan (In re Chin–Liang Chan),* 325 B.R. 432, 438 (Bankr.N.D.Cal.2005).

### 2. *Service Mark Dilution*

 Under the Federal Trademark Dilution Act of 1995 ("FTDA"),[25] the owner of a famous mark is entitled to an injunction "against another person's use in commerce of a mark or trade name, if such use begins after the mark becomes famous[26] and causes dilution of the distinctive quality of the mark...." 15 U.S.C. § 1125(c)(1). "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127. Anti-dilution statutes are intended to prevent "the gradual 'whittling away' of a trademark's value." *Acad. of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir.1991) (quoting 2 J. McCarthy, *Trademarks and Unfair Competition,* § 24:13 (2d ed.1984)). Dilution is actionable because it impermissibly creates an association in the minds of consumers between a famous mark and a different

**23.** Wright's admission was relevant to the issue of likelihood of confusion. Under the *Sleekcraft* test, Wright's intent in selecting the mark was a factor to be considered by the district court in determining likelihood of confusion. If a defendant knowingly adopts a mark similar to another's, a court "must presume that the public will be deceived." *M2 Software, Inc.,* 421 F.3d at 1079; *Official Airline Guides,* 6 F.3d at 1394.

**24.** *See* Footnote # 16, *supra. See also Rolex Watch U.S.A., Inc. v. Meece (In re Meece),* 261 B.R. 403, 409 (Bankr.N.D.Tex.2001) (observing that "[t]he statutory scheme focuses on the probable reaction of buyers, without a requirement of the subjective state of mind of the defendant").

**25.** Pub.L. No. 104–98, 109 Stat. 985 (1995), codified at 15 U.S.C. §§ 1125, 1127.

**26.** The FTDA prescribes the following eight non-exclusive factors for consideration in determining whether or not a mark is "famous:"
(A) the degree of inherent or acquired distinctiveness to the mark;
(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
(C) the duration and extent of advertising and publicity of the mark;
(D) the geographical extent of the trading area in which the mark is used;
(E) the channels of trade for the goods or services with which the mark is used;
(F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;
(G) the nature and extent of use of the same or similar marks by third parties; and
(H) whether the mark was registered ... on the principal register.
15 U.S.C. § 1125(c)(1).

good or service. *Playboy Enters., Inc. v. Welles,* 279 F.3d 796, 805 (9th Cir.2002). To prevail on a federal trademark dilution claim, a plaintiff must demonstrate that (1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish plaintiff's goods and services. *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1324 (9th Cir.1998).

In the district court action, Wright admitted that the COMFORT® marks were "well-known and famous throughout California [and the United States]."[27] Wright further admitted that "[w]hen other companies used any form of 'comfort' in their advertising, it will always point to Comfort Inn in the minds of consumers."[28] Moreover, Choice Hotels established through regular consumer awareness studies that "consumer awareness was at 98% for the COMFORT INN® brand and 81% for the COMFORT SUITES® brand" in 2002. Based on these facts, the district court concluded that Choice Hotels' COMFORT® marks were famous, and that the Infringing marks diluted the COMFORT® marks by causing a likelihood of confusion which reduced the ability of the COMFORT® marks to identify only Choice Hotels' goods or services.

In holding that Wright's Infringing marks diluted the COMFORT® marks in violation of the FTDA, the district court made no specific finding that Wright's ac-

tions were either willful or intentional. Again, it was not necessary for the district court to do so because the FTDA focuses on the likelihood of confusion through the "blurring and tarnishment" of famous marks,[29] not the subjective intent of the defendant. Had the district court found "willful intent," Choice Hotels would have been entitled to a further recovery of actual damages and attorneys fees under the FTDA. 11 U.S.C. § 1125(c)(2). Because the district court was not required to find that Wright acted either intentionally or willfully in holding that Wright's actions diluted the COMFORT marks in violation of the FTDA, issue preclusion does not apply.

### 3. *Unjust Enrichment*

■■■■ Unjust enrichment is not a cause of action under California law. *McBride v. Boughton,* 123 Cal.App.4th 379, 387, 20 Cal.Rptr.3d 115 (2004); *Melchior v. New Line Prods., Inc.,* 106 Cal.App.4th 779, 793, 131 Cal.Rptr.2d 347 (2003). It is, in fact, "a general principle, underlying various legal doctrines and remedies, that one person should not be permitted to unjustly enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly." *Dinosaur Dev., Inc. v. White,* 216 Cal.App.3d 1310, 1315, 265 Cal. Rptr. 525 (1989). Unjust enrichment is

---

**27.** Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 5, l.29–30.

**28.** *Id.* at p. 5, l.31–33.

**29.** "Blurring" occurs when another's use of a mark creates "the possibility that the mark

will lose its ability to serve as a unique identifier of the plaintiff's product." *Panavision, Int'l, L.P.,* 141 F.3d at 1326 n. 7. "Tarnishment" occurs "when a famous mark is improperly associated with an inferior or offensive product or service." *Id.*

synonymous with restitution. *McBride*, 123 Cal.App.4th at 387, 20 Cal.Rptr.3d 115; *Melchior*, 106 Cal.App.4th at 793, 131 Cal. Rptr.2d 347.

 A person is required to make restitution if he or she is unjustly enriched at the expense of another. Restatement (First) Restitution § 1 (1937); *Ghirardo v. Antonioli*, 14 Cal.4th 39, 51, 57 Cal.Rptr.2d 687, 924 P.2d 996, 1003 (1996). Enrichment occurs when a person receives a benefit at another's expense. Restatement, *supra*, § 1, cmt. a; *Ghirardo*, 14 Cal.4th at 51, 57 Cal.Rptr.2d 687, 924 P.2d at 1003. "Benefit" includes any form of advantage. Restatement, *supra*, § 1, cmt. b; *Ghirardo*, 14 Cal.4th at 51, 57 Cal. Rptr.2d 687, 924 P.2d at 1003. Restitution may be appropriate where there has been partial performance of an express contract, or fraud, accident or mistake in the formation of a contract. *See McBride*, 123 Cal. App.4th at 388, 20 Cal.Rptr.3d 115. Alternatively, restitution may be awarded where the benefit received resulted from a defendant's fraud, conversion or other tortious conduct. In such a case, the court implies a contract, notwithstanding the intention of the parties, to prevent unjust enrichment. *Id.*

 The district court granted summary judgment to Choice Hotels on its claim against Wright for unjust enrichment, holding that Choice Hotels was entitled to "[p]ayment of a $47,500 royalty fee by Defendants for the use of the COMFORT MARKS®."[30] In so holding, the district court found only that Choice Hotels "restricts the use of the COMFORT MARKS® by others and requires a licensing fee to be paid for such use."[31] The

district court made no other findings in support of its unjust enrichment award, including any finding that Wright violated an independent duty to Choice Hotels arising from principles of tort law. Restitution was awarded to compensate Choice Hotels for the benefit received by Wright at its expense, *i.e.*, Wright's unauthorized use of the COMFORT® marks. Because restitution does not necessarily require a finding of a deliberate and intentional injury, the district court's ruling on Choice Hotels' unjust enrichment theory has no preclusive effect in this § 523(a)(6) action.

### 4. Cybersquatting

 Cybersquatting is the "deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 267 (4th Cir.2001) (quoting S.Rep. No. 106–140, at 4 (1999)). Cybersquatters register " 'well-known brand names as Internet domain names' in order to force the rightful owners of the marks 'to pay for the right to engage in electronic commerce under their own brand name.' " *Id.* (quoting S.Rep. No. 106–140, at 5). Cybersquatting has been described as "the Internet version of a land grab." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir.2002); *Virtual Works*, 238 F.3d at 267.

 On November 29, 1999, Congress passed the ACPA making it illegal to register or use with the bad faith intent to profit an Internet domain name that is "identical or confusingly similar" to the trademark or domain name of another person or company. 15 U.S.C. § 1125(d)(1)(A).[32] Under the ACPA, a

---

**30.** Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 7, l.27–28.

**31.** *Id.* at p. 7, l.15–16.

**32.** "A number of cybersquatting problems prompted Congressional action. There was concern about individuals registering domain names that are similar to famous marks for

person is a cybersquatter and is liable to the owner of a protected mark if that person:

(i) has a *bad faith intent* to profit from [a mark]; and

(ii) registers, traffics in or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar or dilutive of that mark. . . .

15 U.S.C. § 1125(d)(1)(A) (emphasis added). A finding of "bad faith" is an essential element to any cause of action under the ACPA. *Interstellar Starship,* 304 F.3d at 946. In determining whether a person has "bad faith intent," Congress directed the courts to consider the following nine nonexclusive factors:

1. The trademark or other intellectual property rights of the person, if any, in the domain name;

2. The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

3. The person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

4. The person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

5. The parties intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

6. The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

7. The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

8. The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names,

the purpose of profiting by selling them to the legitimate owners of the marks. Congress was also aware of individuals attaching obscene or pornographic material to an infringing domain name in order to tarnish the mark. Others attempted to divert unsuspecting consumers to their sites in order to engage in unfair competition. . . . The legislative history of the APCA includes findings that cybersquatters were engaged in consumer fraud and creating public confusion as to the true source and sponsorship of goods and services in a way that would impair electronic commerce, deprive trademark owners of substantial revenues and consumer goodwill, and place overwhelming burdens on trademark owners in protecting their valuable intellectual property." *Coca–Cola Co. v. Purdy,* 382 F.3d 774, 778 (8th Cir.2004) (citations omitted).

or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

9. The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous. . . .

15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX). In addition to the nine enumerated factors, a court may rely on other indicia of bad faith intent to profit. *Sporty's Farm, L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 499 (2d Cir.2000) (stating that "[t]he most important grounds for [a finding of bad faith intent] are the unique circumstances of th[e] case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute"). The ACPA also contains a safe harbor provision explaining that bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

With regard to Choice Hotels' ACPA cause of action, the district court found that Wright had a "bad faith intent to profit" from the Infringing domain names in using the COMFORT® marks. Specifically, the district court determined that:

1. Wright's " 'late registration [of the domain names], without any prior bona fide use, demonstrates a bad faith intent to profit parasitically from Choice's advertisement and reputation;' " [33]

2. Wright had no federal, state or common law trademark rights in the Infringing domain names;

3. None of the Infringing domain names were previously used by Wright as a business name;

4. Choice Hotels' rights in the COMFORT® marks dated back to 1981, while the Infringing domain names were registered in 2001;

5. The Infringing domain names provided access to commercial hotel/motel services;

6. There was no evidence of any bona fide noncommercial use by Wright, and

7. Wright created the Infringing domain names with the intent to divert consumer traffic from Choice Hotels' authorized websites.[34]

The district court further found that Wright's Infringing domain names diluted and were confusingly similar to the COMFORT® marks.[35] Based on these findings, the district court held that Wright's attempts to profit in bad faith from Choice Hotels' famous COMFORT® marks violated the ACPA. Choice Hotels was granted injunctive relief and awarded statutory damages under the ACPA of $525,000 ($75,000 for each of the seven Infringing domain names).

E. *Wright's Liability for Statutory Damages Under the ACPA is Nondischargeable*

■ Notwithstanding the district court's specific finding of a "bad faith intent to profit" from the COMFORT® marks, Wright denies that his use of the COMFORT® marks was either willful or malicious. Wright claims that his actions

---

**33.** Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 6, l.18–20 (quoting Order Granting Preliminary Injunction entered on August 18, 2003).

**34.** *Id.* at p. 6, l.18 to p. 7, l.3.

**35.** *Id.* at p. 7, l.4–8.

were motivated, not by a specific intent to harm Choice, but simply by a desire to benefit Choice Hotels as well as himself, describing his efforts to build a relationship with Choice Hotels as "a 'win-win' situation." [36] Wright reasons that an intent to profit, whether in good faith or bad faith, "does not, either expressly or impliedly, carry with it any harm or injury to another." [37] Wright also contends that, despite the district court's award of statutory damages, Choice Hotels was not truly injured by his conduct because there is no evidence of actual damages. According to Wright, "[t]here is no evidence that [Choice Hotels] was ever harmed by [Wright's] use of any of its marks." [38]

An award of statutory damages, which satisfies the criteria for a "willful and malicious injury," constitutes a nondischargeable debt under § 523(a)(6). *Albarran v. New Form, Inc. (In re Albarran)*, 347 B.R. 369, 383 (9th Cir.BAP2006); *Star's Edge, Inc. v. Braun (In re Braun)*, 327 B.R. 447, 452 (Bankr.N.D.Cal.2005). Before the trial court renders a final judgment, the victim of cybersquatting in violation of the ACPA may elect "to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 11 U.S.C. § 1117(d). ACPA statutory damages serve "to deter wrongful conduct and to provide adequate remedies for trademark owners who seek to enforce their rights in court." *See Pinehurst, Inc. v. Wick*, 256 F.Supp.2d 424, 432 (M.D.N.C.2003) (quoting S.Rep. No. 106–140, at 8 (1999)).

Because a finding of "bad faith intent" is an essential element of an ACPA cause of action, the court concludes that Wright's cybersquatting in violation of the ACPA constituted a categorically harmful activity which necessarily caused injury to Choice Hotels within the scope of § 523(a)(6). *See, e.g., Sicroff*, 401 F.3d at 1106–07 (holding that libel necessarily caused harm to a person's reputation and was a "malicious" injury where the debtor had conceded "willfulness"); *Albarran*, 347 B.R. 369, 383 (9th Cir.BAP2006) (concluding that "intentional copyright infringement is a categorically harmful activity and thus is an 'injury,' as that term is used in § 523(a)(6)"); *Braun*, 327 B.R. at 451 (concluding that "if conduct necessarily causes harm, an independent finding of injury is unnecessary").

For purposes of the "willfulness" requirement of § 523(a)(6), the court may infer subjective intent or substantial certainty from the facts and circumstances surrounding the defendant's conduct. *See, e.g., Su*, 290 F.3d at 1146 n. 6 (stating that "[t]he bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action"); *Albarran*, 347 B.R. at 384 (stating that "[s]ubjective intent or substantial certainty may be inferred from all of the facts and circumstances established"). Wright was aware of Choice Hotels' rights in the COMFORT® marks at the time of his infringement. On December 2, 1997, Choice Hotels instructed Wright and Dreamco to cease their unauthorized use of the COMFORT® marks in the telephone number, 1–800–COMFORT, to promote travel industry related services. After exhausting his efforts to obtain a license from Choice Hotels to use

---

36. Wright's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment, p. 5, l.13–15.

37. *Id.* at p. 4, l.19–21.

38. *Id.* at p. 4, l.24–25.

the COMFORT® marks legitimately, Wright incorporated the CCC and devised a plan to "parasitically" profit from the COMFORT® marks without the consent of Choice Hotels. Wright admits acquiring the Infringing domain names with the specific intent to divert COMFORT® customers and consumer traffic from the Choice Hotels' authorized websites and to profit therefrom. The district court found that the Infringing domain names were designed to provide access to commercial hotel/motel services, and that there was no evidence of a bona fide noncommercial use by Wright. Furthermore, Wright was no longer using the 1–800–COMFORT telephone number to sell shoes when the Infringing domain names were registered in 2001. Happy Feet had already ceased doing business. Simply put, when Wright illegally used the Choice Hotels' COMFORT® marks to boost his own Internet traffic, he had actual knowledge that harm to Choice Hotels was substantially certain to occur. *See Su*, 290 F.3d at 1146 (stating that debtor must have "actual knowledge that harm to the creditor was substantially certain").

Having established that Wright's violation of the ACPA was willful and necessarily caused injury to Choice Hotels, the court can imply malice. *Thiara v. Spycher Bros. (In re Thiara)*, 285 B.R. 420, 434 (9th Cir.BAP2002) (observing that "the 'done intentionally' element of a 'malicious' injury brings into play the same subjective standard of intent which focuses on the [defendant's] knowledge of harm to the creditor"). Finally, the summary judgment evidence supports a finding that Wright had no just cause or excuse for his actions. Wright acquired the Infringing domain names with the specific intent to divert consumer traffic from Choice Hotels' authorized websites despite having been informed repeatedly by Choice Hotels to cease and desist his infringement.

Wright offered no evidence in the prior action to establish a "safe harbor" defense to his violation of the ACPA, *i.e.*, that he believed, or had reasonable grounds to believe, that use of the Infringing domain names constituted fair use or was otherwise lawful. Nor has Wright produced significantly probative evidence of specific facts in response to Choice Hotels' motion showing there is a genuine issue of material fact requiring a trial on this issue.

Accordingly, the court finds that Wright's violation of the ACPA was malicious in that it was wrongful, done intentionally, necessarily caused injury to Choice Hotels, and was done without just cause or excuse. Furthermore, the evidence supports a finding that Wright's violation of the ACPA was willful because he had actual knowledge that harm to Choice Hotels was substantially certain to occur as a result of his actions.

## III. CONCLUSION

There being no genuine issue as to any material fact for trial, the court finds that Choice Hotels is entitled to a summary judgment as a matter of law. For the foregoing reasons, Choice Hotels' judgment for statutory damages against Wright in the amount of $525,000, plus interest from May 11, 2004, is excepted from discharge under 11 U.S.C. § 523(a)(6).

A separate judgment will be entered consistent with this opinion.